IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

THERESA DIANE KNIGHT,                                      Case No. 1:15-cv-02402-SB

     Plaintiff,                                                       **OPINION AND**
                                                                                    **ORDER**
     v.

CAROLYN W. COLVIN,
Commissioner of Social Security,

     Defendant.

_____

**BECKERMAN, Magistrate Judge.**

     Theresa Knight ("Knight") brings this appeal challenging the Commissioner of Social

Security's ("Commissioner") denial of her applications for Social Security disability insurance

benefits and Supplemental Security Income under Titles II and XVI of the Social Security Act,

42 U.S.C. §§ 401-34, 1381-83f. The Court has jurisdiction to hear this appeal pursuant to 42

U.S.C. §§ 405(g) and 1383(c)(3). For the reasons that follow, the Commissioner's decision is

reversed and remanded for an award of benefits.

## BACKGROUND

     Knight stands five-feet, four-inches tall. She was born in August 1963, making her forty-

six years old on October 19, 2009, the alleged disability onset date. Knight is a college graduate,

and her past relevant work includes time as a residence supervisor, case aide, special education teacher, and elementary school teacher. Knight alleges disability and seeks benefits due primarily to bipolar disorder, posttraumatic stress disorder ("PTSD"), depression, and arthritis.

On August 11, 2009, approximately two months before Knight stopped working and alleged the onset of disability, Knight presented for a follow-up visit at the Child and Family Psychiatric Center of Southern Oregon. Knight reported that she was experiencing issues at work, planned to go on a nine-day trip to Italy, and was exercising. Knight's medical provider noted that Knight was "[s]table on med[ical] regimen." (Tr. 369.) A few months later, however, Knight reported that she was having difficulty keeping up with her forensic psychology work at graduate school, and her provider noted that Knight experiences "significant stressors yet [pursues] appropriate intervention." (Tr. 368.)

On October 23, 2009, Knight visited Dr. Dee Christlieb ("Dr. Christlieb") at the Providence Medford Medical Center. Knight reported that she was "getting reviewed . . . for disciplinary action at work and may be losing her insurance," which in turn would impact her ability to afford her bipolar disorder medication, Abilify. (Tr. 377.) Dr. Christlieb noted that Knight's counselor, Devon Smith ("Smith"), was concerned that Knight "may have some resurgence of her manic depression off Abilify[.]" (Tr. 377.)

On February 24, 2010, Knight visited Dr. Christlieb and reported that she hurt her back while "lifting a couch up a flight of stairs[.]" (Tr. 401.) Knight also reported experiencing an exacerbation of her fibromyalgia-related joint pain after "doing some digging a couple of weeks" before the visit. (Tr. 401.) Dr. Christlieb renewed Knight's prescription for Vicodin, but advised her to use it sparingly.

PAGE 2 – OPINION AND ORDER

On April 16, 2010, Knight visited Dr. Christlieb and reported that she hurt her back while "lifting a dresser which was a little heavier than she thought[.]" (Tr. 400.) Dr. Christlieb renewed Knight's prescription for Vicodin, and advised Knight that "narcotics for fibromyalgia can be very counterproductive" and "does not solve the problem." (Tr. 400.) Dr. Christlieb also noted that recent antinuclear antibody panel ("ANA"), rheumatoid factor, and C-reactive protein ("CRP") tests "were normal." (Tr. 400.)

During a visit with Dr. Christlieb on February 22, 2011, Knight admitted "to being probably in a manic phase since the death of her cat" in December 2010. (Tr. 398.) Knight also reported that she was groped "in the genital region" by a man while attending a week-long "mental health residency program" in Denver, which "brought back a flood of information and memories of when this happened when she was a child at [nine] years old, heightening again her mania and her PTSD." (Tr. 398.)

In the months that followed, Dr. Christlieb observed that Knight's bipolar disorder had been problematic over the "last couple of years, despite being on medications," and "is not under good control." (Tr. 388-89.) Dr. Christlieb also noted that Knight "has not been regulated with regard to a good medical regimen for control of her bipolar disorder," Knight "failed graduate school in two different sessions," "in the past even in the best situations [Knight's] control [of bipolar disorder] is marginal," Knight is "still at a hypomanic state," and she "think[s] [Knight] is forced to pursue [Social Security benefits]." (Tr. 388, 392-93.)

On March 22, 2012, Knight underwent a consultative psychological examination with Dr. Rebecca Breiholz ("Dr. Breiholz"). Based on the results of a mental status examination, Dr. Breiholz determined that Knight is capable of understanding and remembering instructions and performing simple and repetitive tasks, would "likely" have difficulty performing more detailed

and complex tasks due to her manic symptoms, would "likely" have difficulty dealing with stress in a competitive work environment "secondary to affective lability," and has "a history of poor interpersonal relations with both supervisors and coworkers, often resulting in her termination from previous jobs." (Tr. 507.)

On April 17, 2012, Dr. Lloyd Wiggins ("Dr. Wiggins"), a non-examining state agency physician, completed a physical residual functional capacity assessment. Dr. Wiggins concluded that Knight could lift and carry fifty pounds occasionally and twenty-five pounds frequently; stand, sit, or walk for six hours in an eight-hour workday; and push or pull in accordance with her lift and carry restrictions. Dr. Wiggins found no postural, manipulative, visual, communicative, or environmental limitations.

On April 24, 2012, Dr. Kordell Kennemer ("Dr. Kennemer"), a non-examining state agency psychologist, completed a psychiatric review technique assessment. Dr. Kennemer determined that the limitations imposed by Knight's mental impairments failed to satisfy listing 12.04 (affective disorders).[1]

Also on April 24, 2012, Dr. Kennemer completed a mental residual functional capacity assessment based on his review of the record. Dr. Kennemer found that Knight was not significantly limited in twelve categories of mental activity and moderately limited in eight. Dr. Kennemer added that Knight is capable of remembering short, simple instructions and work-like procedures; carrying out short, simple instructions; making simple work-related decisions; completing a normal workday despite mental health conditions interfering with her ability to carry out detailed instructions; performing solitary work and indirect work with the public and

---

[1] The Listing of Impairments is found at 20 C.F.R. Pt. 404, Subpt. P, App. 1, and described at 20 C.F.R. §§ 404.1525, 404.1526, 416.925, 416.926.

co-workers; asking simple questions and adhering to basic hygiene; traveling and using public transportation; and working in a low stress environment.

On May 3, 2012, Knight appeared for a consultation with Dr. Diane Powell ("Dr. Powell"). Knight reported difficulties with mania and joint and muscle pain, which "might be fibromyalgia or an autoimmune condition." (Tr. 521.) Knight added that she was "supposed to see a rheumatologist for a definitive diagnosis." (Tr. 521.) Dr. Powell diagnosed bipolar disorder, PTSD, and mild obsessive compulsive disorder ("OCD"), and assigned a Global Assessment of Functioning ("GAF") score of forty.[2]

During a follow-up visit on May 30, 2012, Knight informed Dr. Powell that her "bipolar symptoms" were "bothering [her] the most," that she "feels that the Abilify has helped her outbursts more than anything," and that she no longer takes Abilify "because of the expense." (Tr. 524.) Since Dr. Powell assessed that Knight's "anger was under better control . . . on a higher dose of Abilify," Dr. Powell increased Knight's dosage of Abilify and planned "to completely switch over to Abilify from Seroquel." (Tr. 524.)

Knight continued to visit Dr. Powell every couple of weeks in the months that followed. At those visits, Knight reported experiencing "intense hip pain," which was "significantly better" after receiving treatment, but nevertheless interfered with her ability to concentrate. (Tr. 525-27.) Knight also reported some improvements in her mood after Dr. Powell increased her dosage of Abilify; however, Dr. Powell noted that Knight could not afford to pay for the necessary higher dosage. (Tr. 527.)

---

[2] A GAF score is a rough estimate of an individual's psychological, social, and occupational functioning used to reflect the individual's need for treatment. *Vargas v. Lambert*, 159 F.3d 1161, 1172 n.2 (9th Cir. 1998) (citation omitted). "A GAF score of [forty] indicates serious symptoms or serious impairment in school, social or occupational functioning" *Garcia v. Colvin*, No. 2:15-cv-0384, 2016 WL 796658, at *4 n.2 (E.D. Cal. Mar. 1, 2016).

On October 22, 2012, Dr. Neal Berner ("Dr. Berner"), a non-examining state agency physician, issued a second physical residual functional capacity assessment, wherein he agreed with Dr. Wiggins' conclusion that Knight can lift and carry fifty pounds occasionally and twenty-five pounds frequently, stand, sit, or walk for six hours in an eight-hour workday, and push or pull in accordance with her lift and carry restrictions. He also agreed with Dr. Wiggins' conclusion that Knight does not suffer from any postural, manipulative, visual, communicative, or environmental limitations.

On October 23, 2012, Dr. Paul Rethinger ("Dr. Rethinger"), a non-examining state agency psychologist, reviewed the record and issued a second psychiatric review technique assessment, agreeing with Dr. Kennemer's initial conclusion that Knight's mental impairments failed to satisfy listing 12.04.

Also on October 23, 2012, Dr. Rethinger issued a second mental residual functional capacity assessment. In this assessment, Dr. Rethinger agreed with Dr. Kennemer's conclusion that Knight is moderately limited in eight of twenty categories of mental activity and not significantly limited in twelve.

During a visit on December 21, 2012, Knight informed Dr. Powell that she recently qualified for vocational rehabilitation, "sees organization of her thoughts as a primary problem in working," and "also gets overwhelmed and loses her ability to focus when her PTSD is triggered by something such as someone being aggressive." (Tr. 567.) Dr. Powell noted that Knight had been "doing better since adding" Celexa to her medication regimen, and spoke with Knight about the possibility of becoming a medical technician. (Tr. 567.)

On January 15, 2013, Knight underwent a consultative physical examination with Dr. Brian Dossey ("Dr. Dossey"). Dr. Dossey, who was not provided with any of Knight's medical

records, examined Knight and determined that she is capable of standing, sitting, and walking up

to six hours, and has no limitations in terms of her ability to lift and carry, climb, balance, stoop,

kneel, crouch, crawl, reach, handle, finger, feel, or work around workplace hazards, such as

heights and heavy machinery. Dr. Dossey added that he "palpate[d] for fibromyalgia points [and]

16/18 were positive." (Tr. 543.)

Knight returned to Dr. Powell's office on February 28, 2013, and reported that she was

doing better. Dr. Powell observed that Knight's "mood feels like it's in the normal range," and

that she "gets exasperated with her partner's mother, but otherwise doesn't have any symptoms

that she associated with hypomania." (Tr. 565.) Dr. Powell added that Knight was "doing better"

on the reduced dosage of Abilify, but Dr. Powell was "afraid to reduce" Knight's dosage "further

at th[at] time." (Tr. 565.)

During a consultation on March 28, 2013, Knight informed Dr. Powell that she was

"doing better but . . . struggling about money." (Tr. 564.) Knight also reported that she had "been

trying to find a job but she is either overqualified, or the position is something that would be too

stressful for her." (Tr. 564.) Dr. Powell observed that Knight was "continuing to do well," but

"struggling with some relationship issues." (Tr. 564.) Dr. Powell advised Knight to continue

medications and psychotherapy.

On March 29, 2013, Knight underwent a consultative psychological examination with Dr.

Scott Alvord ("Dr. Alvord"). Based on a clinical interview and review of "limited historical

records," Dr. Alvord's diagnoses were: bipolar effective disorder and PTSD (Axis I); self-

reported diagnosis of fibromyalgia (Axis III); psychological stressors, such as limited social

interactions, financial strain, occupational limitations, history of childhood abuse, and history of

sexual assault (Axis IV); and a GAF score of forty-five to fifty-five.[3] (Tr. 548.) Dr. Alvord added that Knight "meets the trauma criteria for PTSD," has a "guarded" prognosis, and "is in need of intensive psychiatric treatment," despite reports that "medications and/or therapeutic interventions in the past have been limited in their efficacy." (Tr. 548.)

Knight reported an increase in her irritability during follow-up visits with Dr. Powell on April 24 and May 29, 2013. (Tr. 562-63.) After Dr. Powell increased Knight's dosage of Abilify, however, Knight reported that she was less irritable during a follow-up visit on June 18, 2013. (Tr. 561.) During that visit, Dr. Powell also observed that Knight was "doing better" and "[m]uch of her current mood lability is situational and due to her OCD worsening under lack of control/high." (Tr. 561.)

In the months that followed, Knight visited Dr. Powell on several occasions and reported experiencing issues with anger outbursts and increased explosiveness, some of which improved on a decreased dosage of Abilify. (Tr. 559-60.) Knight also reported experiencing fibromyalgia-related pain. (Tr. 559.) Dr. Powell noted that Knight was "doing slightly better in terms of her OCD but under a lot of stress due to her relationship with her girlfriend's mother and financial issues." (Tr. 558.)

On October 24, 2013, Knight visited Dr. Powell and reported that she was working a couple of hours a day for her partner in an unspecified capacity, that she could not work more than a couple of hours a day due to her fibromyalgia, and that "things [were] better because [she

---

[3] A GAF score of forty-five "indicates 'serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).'" *Williams v. Colvin*, 757 F.3d 610, 613 (7th Cir. 2014) (citation omitted). A GAF score of fifty-five indicates at least moderate symptoms or moderate difficulty in social, occupational, or social functioning. *Vargas*, 159 F.3d at 1172.

was] more in control of [her] life." (Tr. 556.) Dr. Powell advised Knight to continue

"medications and psychotherapy." (Tr. 556.)

Knight returned to Dr. Powell's office on December 13, 2013. During the visit, Knight

"came forth with information now that she didn't tell [Dr. Powell] before because she didn't

know [her]." (Tr. 629.) For example, Knight had never informed Dr. Powell "about how close

she came to committing suicide shortly before" they met, because she was "afraid that [Dr.

Powell] would lock her up." (Tr. 629.) Dr. Powell noted that Knight has a disability claim "she is

pursuing and . . . [she] realizes that she needs to be less protective of her pride and [describe]

how she's really doing." (Tr. 629.)

Also on December 13, 2013, Dr. Powell completed a Mental Impairment Questionnaire.

In the questionnaire, Dr. Powell observed that Knight suffers primarily from bipolar disorder,

PTSD, and obsessive compulsive disorder ("OCD"), cannot "afford to come frequently enough

to benefit fully" from psychotherapy, suffers from fibromyalgia and PTSD "which haven't

responded to treatment," and would be absent from work "more than four days per month" due

to her combination of impairments or treatment needs. (Tr. 621, 624.) Dr. Powell added that

Knight suffers from moderate restriction of activities of daily living, moderate difficulties in

maintaining social functioning, and marked difficulties in maintaining concentration, persistence,

or pace, but has not experienced any episodes of decompensation within a twelve-month period,

"each of at least two weeks duration[.]" (Tr. 622.) Finally, Dr. Powell indicated that Knight

meets the criteria of listing 12.04 (affective disorders).[4] (See Tr. 622-23.)

---

[4] To meet or equal an affective disorder under listing 12.04, a claimant "must satisfy (1)
both the paragraph A and paragraph B requirements, or (2) the paragraph C requirements
detailed in [the listing]." *Hakmat v. Colvin*, No. 2:12-cv-1219, 2014 WL 2769128, at *8 (E.D.
Cal. June 18, 2014). Paragraph C of listing 12.04 is met when there is a "[m]edically documented
history of a chronic affective disorder of at least [two] years' duration that has caused more than

Knight presented for a follow-up visit with Dr. Powell on February 4, 2014. Knight reported that she was "better except for the fibromyalgia," felt better because the weather was more spring-like, did not feel hypomanic, and was open to the possibility of adjusting her diet in order to improve her fibromyalgia. (Tr. 627.) Dr. Powell assessed that Knight was "[f]eeling much better," but still in physical pain. (Tr. 627.)

An administrative law judge ("ALJ") convened a hearing on April 11, 2014, at which Knight testified about the limitations resulting from her impairments. Knight testified that she last worked in October of 2009, received unemployment for "about two years," last applied for work around October 2013, was sexually assaulted as a child, suffers from arthritis in her knees, hands, and hips, experiences pain while sitting, bending, stretching, and squatting due to hip pain, and would not be able to function in a work setting "[a]bout six or seven" days per month. (Tr. 38, 53.) In terms of daily activities, Knight stated that she walks at a local high school track on a daily basis, but never exceeds more than a mile, cleans the house, does the dishes and laundry, "piddle[s] around in the yard," sits under her gazebo and listens to music, reads "lots of books," plays with her cats and dog, goes to appointments with her partner, and "picks things up a little bit" and runs errands when necessary. (Tr. 50-51.) Knight added that her primary barriers to employment are her panic attacks, inability to "deal[] with people," and inability to perform manual work due to physical pain. (*See* Tr. 42-43, 49, 54.)

The ALJ posed hypothetical questions to a vocational expert ("VE") who testified at the hearing. First, the ALJ asked the VE to assume that a hypothetical worker of Knight's age,

---

a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and . . . [a] residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate[.]" *Sunwall v. Colvin*, 158 F. Supp. 3d 1077, 1080-81 (D. Or. 2016). The boxes that Dr. Powell checked on the questionnaire indicate that Knight satisfies the paragraph C criteria.

education, and work experience could perform light exertion work, but would need to be limited

to simple, routine, and repetitive tasks, occasional interaction with co-workers and the general

public, and a "low stress job environment," which the ALJ defined as involving only occasional

decision making, exercise of personal judgment, and changes in the work setting. (Tr. 58.) The

VE stated that the hypothetical worker could not perform any of Knight's past relevant work, but

the hypothetical worker could be employed as a small products assembler I and office helper.

The VE further testified that there were 56,000 small products assembler I jobs and 93,000 office

helper jobs available in the national economy.

Responding to the ALJ's second hypothetical, the VE testified that the hypothetical

worker described above could perform the jobs of small products assembler I and hand packager,

even if a supervisor needed to check her work up to four times a day. The VE, however, ruled

out the position of office helper. The VE added that there are 62,000 hand packager jobs

available in the national economy. The VE also stated that being off-task during twenty to

twenty-five percent of the workday or exceeding one unexcused absence per month would

preclude the performance of competitive work.

In a written decision issued on April 25, 2014, the ALJ applied the five-step process set

forth in in 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4), and found that Knight was not

disabled. *See infra*. The Social Security Administration Appeals Council denied Knight's

petition for review, making the ALJ's decision the Commissioner's final decision. Knight timely

appealed to federal court.

<b>THE FIVE-STEP SEQUENTIAL ANALYSIS</b>

**I.    LEGAL STANDARD**

A claimant is considered disabled if he or she is unable to "engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which

. . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). "Social Security Regulations set out a five-step sequential process for determining whether an applicant is disabled within the meaning of the Social Security Act." *Keyser v. Comm'r Soc. Sec. Admin.*, 648 F.3d 721, 724 (9th Cir. 2011). Those five steps are as follows:

> (1) Is the claimant presently working in a substantially gainful activity? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal [one of the listed impairments]? (4) Is the claimant able to perform any work that he or she has done in the past? and (5) Are there significant numbers of jobs in the national economy that the claimant can perform?

*Id.* at 724-25. The claimant bears the burden of proof for the first four steps in the process. *Bustamante v. Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001). If the claimant fails to meet the burden at any of the first four steps, the claimant is not disabled. *Id.*; *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987).

The Commissioner bears the burden of proof at step five of the process, where the Commissioner must show the claimant can perform other work that exists in significant numbers in the national economy, "taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999). If the Commissioner fails to meet this burden, the claimant is disabled. *Bustamante*, 262 F.3d at 954 (citations omitted).

## II.    THE ALJ'S DECISION

At the first step of the analysis, the ALJ found that Knight had not engaged in substantial gainful activity since October 29, 2009, the alleged disability onset date. At step two, the ALJ found that Knight had the severe impairments of: "affective disorder, bipolar"; anxiety disorder;

PTSD; "personality disorder, obsessive-compulsive disorder"; and "tendonitis bilateral upper extremities." (Tr. 15.)

At the third step, the ALJ concluded that Knight's combination of impairments was not the equivalent of those on the Listing of Impairments. The ALJ then assessed Knight's residual functional capacity ("RFC") and found that she could perform light work, but needed to be limited to simple, routine, repetitive tasks, a "low stress job, defined as only occasional decision making or judgment required and only occasional changes in the work setting," a position where a supervisor checked work four times a day, occasional interaction with co-workers, and no interaction with the public. (Tr. 18.)

At the fourth step, the ALJ found that Knight was not capable of performing any past relevant work. At the fifth step, the ALJ concluded that there were other jobs existing in significant numbers in the national economy that Knight could perform, such as a small products assembler and hand packager. Thus, the ALJ found that Knight was not disabled within the meaning of the Social Security Act.

## STANDARD OF REVIEW

The district court may set aside a denial of benefits only if the Commissioner's findings are "'not supported by substantial evidence or [are] based on legal error.'" *Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)). Substantial evidence is defined as "'more than a mere scintilla [of evidence] but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).

The district court "cannot affirm the Commissioner's decision 'simply by isolating a specific quantum of supporting evidence.'" *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir.

2001) (quoting *Tackett*, 180 F.3d at 1097). Instead, the district court must consider the entire record, weighing the evidence that both supports and detracts from the Commissioner's conclusions. *Id.* If the evidence as a whole can support more than one rational interpretation, the ALJ's decision must be upheld; the district court may not substitute its judgment for the judgment of the ALJ. *Bray*, 554 F.3d at 1222 (citing *Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007)).

## DISCUSSION

In this appeal, Knight argues that the ALJ erred by failing to: (1) offer legally sufficient reasons for discounting Dr. Powell's medical opinion evidence; (2) properly account for the lay witness statements offered by Knight's partner, Jay Dee Barry ("Barry"); (3) conclude that Knight meets or equals listings 12.04 and 12.06; (4) formulate an RFC and VE hypothetical that accounts for all of Knight's credible limitations; and (5) offer specific, clear, and convincing reasons for discrediting Knight's testimony. The Court concludes that the ALJ's rejection of Dr. Powell's opinion was not supported by substantial evidence, that Knight satisfies all three conditions of the credit-as-true rule, and that a careful review of the record discloses no reason seriously to doubt that Knight is, in fact, disabled.

## I.    MEDICAL OPINION EVIDENCE

### A.    Applicable Law

"There are three types of medical opinions in social security cases: those from treating physicians, examining physicians, and non-examining physicians." *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 692 (9th Cir. 2009) (citing *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)). In the event "a treating or examining physician's opinion is contradicted by another doctor, the '[ALJ] must determine credibility and resolve the conflict.'" *Id.* (quoting *Thomas v. Barnhart*, 278 F.3d 947, 956-57 (9th Cir. 2002)). "An ALJ may only reject a treating physician's

contradicted opinions by providing specific and legitimate reasons that are supported by substantial evidence." *Ghanim v. Colvin*, 763 F.3d 1154, 1161 (9th Cir. 2014) (citation and quotation marks omitted).

"An ALJ can satisfy the 'substantial evidence' requirement by 'setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings.'" *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (quoting *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)). Merely stating conclusions is insufficient: "The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Id.* "[A]n ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion." *Id.* at 1012-13 (citation omitted).

### B.    Application of Law to Fact

Knight argues the ALJ failed to offer sufficient reasons for discounting Dr. Powell's opinion, in particular her opinion that Knight satisfies the paragraph C criteria of, *inter alia*, listing 12.04. The Court agrees.

Dr. Powell's Mental Impairment Questionnaire dated December 13, 2013, conflicts with the psychiatric review technique assessments completed by Drs. Kennemer and Rethinger, neither of whom opined that Knight satisfies the paragraph C criteria of listing 12.04. (*Compare* Tr. 71, *and* Tr. 101, *with* Tr. 622-23.) Therefore, the ALJ needed to provide specific and legitimate reasons for discrediting Dr. Powell's opinion. *See Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004) ("[I]n the case of a conflict 'the ALJ must give specific, legitimate reasons for disregarding the opinion of the treating physician.'");

PAGE 15 – OPINION AND ORDER

*Barnhart*, 226 F. App'x 666, 668 (9th Cir. 2007) ("Killian's contention that the ALJ erred when he discounted her treating physician's opinion is flawed because the treating physician's opinion conflicted with that of a nonexamining physician, and the ALJ supported his decision with specific and legitimate reasons."). The ALJ failed to do so.

The ALJ first discounted Dr. Powell's opinion on the ground that it is inconsistent with her treatment notes. By way of example, the ALJ observed that Dr. Powell identified severe restrictions, yet her treatment notes reflected that Knight "became stable very quickly" when her medications were regulated, and reported that her mental impairments improved on medication. (Tr. 23.) A conflict between treatment notes and a treating provider's opinion may constitute a specific and legitimate reason to discount the provider's opinion. *See Valentine*, 574 F.3d at 692-93 (holding that a conflict with treatment notes is a specific and legitimate reason to reject treating physician's opinion). Here, however, substantial evidence does not support the ALJ's conclusion regarding Dr. Powell's opinion.

Dr. Powell's Mental Impairment Questionnaire acknowledges that Knight's medications have helped her mood, irritability, and OCD symptoms, but Dr. Powell nevertheless opined that Knight's prognosis is "fair to poor," Knight cannot afford to attend individual psychotherapy "frequently enough to benefit fully," Knight's PTSD has not "responded to treatment," and Knight "can appear to be fine one moment and then break down into tears." (Tr. 622.) Dr. Powell further opined that Knight exhibits a number of signs and symptoms of psychological impairment, including a pervasive loss of interest in almost all activities; thoughts of suicide; recurrent and intrusive recollections of a traumatic experience (i.e., sexual abuse as a child and sexual assault), which are a source of marked distress; bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive

symptoms (and currently characterized by either or both syndromes); recurrent obsessions and compulsions which are a source of marked distress; emotional lability; and recurrent severe panic attacks manifested by a sudden and unpredictable onset of intense apprehension, fear, terror, and sense of impending doom occurring on the average of at least once a week.[5] (Tr. 622-23.) Dr. Powell also indicated that Knight satisfied the paragraph C criteria of listing 12.04 and thus is presumptively disabled, and that Knight's impairments or treatment would cause her to miss work "more than four days per month," which would also preclude gainful employment. (*See* Tr. 60, 622-24.)

It is well settled that references to stability or signs of improvement must be read in context of the overall diagnostic picture drawn by the provider. *See Flowers v. Colvin*, No. 6:14-cv-01951, 2016 WL 807693, at *10 (D. Or. Feb. 11, 2016) (discussing use of the term "stable," and noting that stability does not necessarily equate to an ability to work and could mean only that the condition has not changed); *Gagnon v. Colvin*, No. 6:15-cv-00988, 2016 WL 3450825, at *8-9 (D. Or. June 22, 2016) (explaining that signs of improvement must be read in context of the overall diagnostic picture the provider draws). In light of the opinions expressed in the Mental Impairment Questionnaire, it is clear that Dr. Powell believes Knight is unable to sustain competitive employment, regardless of whether she exhibited signs of improvement and periods of stability.[6] Thus, the ALJ failed to read Dr. Powell's treatment notes in context of the overall

---

[5] Although these opinions were expressed in check-box form, they were based on significant experience with Knight and supported by record evidence, "and were therefore entitled to weight that an otherwise unsupported and unexplained check-box form would not merit." *Garrison*, 759 F.3d at 1013.

[6] Dr. Christlieb similarly observed that Knight could be "a functional member of society" (not necessarily an individual who could sustain full-time, competitive work) if her "medications could be regulated," but added that Knight's lack of income and insurance contributes to a "cycle of inadequate medical treatment and access to specialists, which . . . prevents her from being able to hold onto a stable job," Knight's bipolar disorder "is not under good control," and "even in the

diagnostic picture she drew. Accordingly, the ALJ erred in rejecting Dr. Powell's opinion evidence as inconsistent with her treatment notes. *Cf. Lester*, 81 F.3d at 833 ("Occasional symptom-free periods . . . are not inconsistent with disability."); *Holohan*, 246 F.3d at 1205 (explaining that the fact that a person suffering from a mental impairment makes some improvement "does not mean that the person's impairment[] no longer seriously affect[s] her ability to function in the workplace"); *Kohler v. Astrue*, 546 F.3d 260, 268 (2d Cir. 2008) (explaining that the ALJ had a "tendency to overlook or mischaracterize relevant evidence," and that the ALJ "consistently interpret[ed] reports that [the claimant's] condition has been 'stable' to mean that [her] condition has been good, when the term could mean only that her condition has not changed").

Next, the ALJ discounted Dr. Powell's opinion on the ground that it is inconsistent with Knight's reported activities. Specifically, the ALJ rejected Dr. Powell's opinion that Knight suffers from severe restrictions, including marked limitations in maintaining concentration, because Knight took "online college and graduate level classes (though she says she did not pass)" during the alleged period of disability, Knight testified that she "reads (a lot, it would seem, based on testimony), takes care of the house and garden," and "felt well enough to look for a job . . . [and] do her activities of daily living." (Tr. 23.) The ALJ added that Knight "is really pretty normal except that she can be easily irritated." (Tr. 23.)

The ALJ's reliance on the foregoing activities to discredit Dr. Powell's opinion is misplaced. The Ninth Circuit has recognized that "disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations." *Reddick*, 157 F.3d at 722; *see*

---

best situations her control is marginal." (Tr. 388.) Although the ALJ assigned less weight to Dr. Christlieb's opinion (Tr. 22), it is noteworthy that another treating provider drew a diagnostic picture similar to Dr. Powell's.

*also Cooper v. Bowen*, 815 F.2d 557, 561 (9th Cir. 1987) ("Disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity.") (citation omitted). The fact that Knight looked for work during the period of disability is not a sufficient reason to discount a treating provider's opinion, in the absence of some evidence suggesting Knight was pursuing full-time work. *See Mulanax v. Comm'r of Soc. Sec.*, 293 F. App'x 522, 523 (9th Cir. 2008) (explaining that eligibility for disability benefits under the Social Security Act is predicated on an inability to sustain full-time work, not part-time work, which is why the receipt of unemployment benefits is not necessarily inconsistent with the filing of a disability application, absent evidence that the claimant represented to the unemployment office that he or she was ready, able, and applying for full-time positions); *see also Manzo v. Soc. Sec. Admin.*, No. 10-cv-01062-HZ, 2011 WL 4828818, at *5 (D. Or. Oct. 11, 2011) (citing the above passages from *Reddick* and *Cooper*, and holding that the claimant's willingness to look for a job was not a clear and convincing reason to reject the claimant's testimony).

Knight's limited daily activities and failure to complete online graduate coursework also do not undermine Dr. Powell's opinion. The ALJ assigned "great weight" to the testimony provided by Knight's partner, Barry. (Tr. 23.) Barry testified that Knight gardens only on a limited basis during the summer, "has trouble" with gardening and reading due to "her mood swings [and] distractibility," reads only one to two books per year, and cannot "concentrate to read much[.]" (Tr. 304, 346.) In regard to Knight's online coursework, Barry testified Knight has "failed over and over" because "her mental state kept her from completing papers on time," she would "get agitated and frustrated or [she would get] fixated on one part of the project," and she missed deadlines, exhibited poor time management, and was unable to complete projects due to depressive episodes. (Tr. 309.) Barry also testified Knight's concentration is "significantly

affected by her mental condition and almost daily mania," Knight "has large and frequent mood swings — goes from happy to agitation to crying and back — sometimes multiple times a day," "physical activities are either very painful at the time or else create pain later from doing them," and Knight's ability to perform household chores depends on whether she is "manic or depressed," and even then her activity is "interspersed with rest periods." (Tr. 308, 312, 351-52.)

From the Court's perspective, it was not reasonable for the ALJ to conclude that Knight's activities are inconsistent with Dr. Powell's opinion, given the degree of limitation described by Barry. The ALJ assigned Barry's testimony "great weight," and it provides necessary context for assessing Knight's activities and whether they are truly inconsistent with an opinion that would support a finding of disability. By failing to consider Barry's lay witness testimony, the ALJ erred in discounting Dr. Powell's opinion regarding the severity of Knight's restrictions. *See Nguyen*, 100 F.3d at 1467 ("By failing to include in the hypothetical the physical manifestations that were described by the [lay] witnesses or expressly rejecting the testimony for legitimate reasons, the ALJ erred."); *Hughes v. Colvin*, No. 13-cv-480-SI, 2014 WL 3546861, at *4 (D. Or. July 16, 2014) (explaining that if an ALJ finds lay testimony credible, "the ALJ errs by failing to incorporate the limitations found in that testimony into the claimant's RFC" and the hypothetical posed to the VE).

For these reasons, the Court concludes that the ALJ erred in rejecting Dr. Powell's opinion evidence.

## II.    LISTING 12.04

As discussed above, to meet or equal an affective disorder under listing 12.04, a claimant "must satisfy (1) both the paragraph A and paragraph B requirements, or (2) the paragraph C requirements detailed in [the listing]." *Hakmat*, 2014 WL 2769128, at *8. Paragraph C of listing 12.04 is met when there is a "[m]edically documented history of a chronic affective disorder of

at least [two] years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support," as well as "[a] residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be *predicted* to cause the individual to decompensate[.]" *Sunwall*, 158 F. Supp. 3d at 1080-81 (emphasis added). Dr. Powell's questionnaire states that Knight satisfies the foregoing criteria (i.e., listing 12.04(C)(2)). (Tr. 623-24.)

The Commissioner disputes Knight's assertion that she meets or equals listing 12.04(C)(2), arguing that Dr. Powell "identified no basis for her prediction" that a minimal increase in mental demands or change in the environment would cause Knight to decompensate. (Def.'s Br. at 6.) As an initial matter, and implicit from the discussion above, the Court agrees with Knight that the ALJ did not reject Dr. Powell's opinion on this ground. (*See* Tr. 23; Pl.'s Reply at 2.) Rather, in discussing equivalency in his written opinion, the ALJ merely concluded that Knight failed to satisfy the criteria of 12.04(C)(2) after finding that "the file contains no evidence of a tendency to decompensate[.]" (Tr. 18.)

Well-settled principles of administrative law require the Court "to review the ALJ's decision based on the reasoning and factual findings offered by the ALJ — not *post hoc* rationalizations that attempt to intuit what the adjudicator may have been thinking." *Bray*, 554 F.3d at 1225 (citations omitted). As discussed, the ALJ's reasons for discounting Dr. Powell's opinion were not supported by substantial evidence. Furthermore, although Dr. Powell's opinion on equivalency was expressed in a check-box form, it was based on significant experience treating Knight, and was no more unexplained than the opinions issued by the non-examining state agency psychologists. Indeed, Drs. Rethinger and Kennemer stated, in a conclusory fashion,

that the "[e]vidence does not establish the presence of the 'C' criteria." (Tr. 71, 101.) Dr. Powell's numerous supporting records and status as a long-time treating provider entitle her to greater deference. *See Garrison*, 759 F.3d at 1013.

Furthermore, based on the Court's reading of listing 12.04(C)(2), the listing requires only a prediction that the claimant would decompensate as a result of "even a marginal increase in mental demands or change in the environment," not evidence of past decompensation. The parties have not cited authority to the contrary, and at least one district court has made the same observation. *See Ross v. Astrue*, No. 08-cv–00676, 2009 WL 1376709, at *4 n.8 (W.D. Okla. May 14, 2009) ("[T]he listing at 12.04(C)(2) does not require evidence of decompensation in the past."); (*but see* Def.'s Br. at 6-7, "in the absence of any prior evidence of a tendency to decompensate, there was no foundation for Dr. Powell's estimated future decompensation"). It would be antithetical to the language of listing 12.04(C)(2) to require the claimant to present past evidence of a tendency to decompensate when the listing refers only to the anticipated outcome from a minimal increase in mental demands or change in the environment.

In light of the foregoing, and in light of the fact that the ALJ failed to provide specific and legitimate reasons that were supported by substantial evidence for rejecting Dr. Powell's opinion, the Court finds that the ALJ erred in concluding that Knight failed to satisfy, at a minimum, listing 12.04(C)(2).

## III.    VE HYPOTHETICAL AND RFC DETERMINATION

"The hypothetical an ALJ poses to a [VE], which derives from the RFC, 'must set out all the limitations and restrictions of the particular claimant.'" *Valentine*, 574 F.3d at 690 (citation omitted). Therefore, "an RFC that fails to take into account a claimant's limitations is defective." *Id.*; *see also* Burke v. Comm'r of Soc. Sec., No. 13–1890, 2015 WL 769951, at *5 (D. Or. Feb. 23, 2015) ("An ALJ's RFC need only incorporate credible limitations supported by substantial

evidence in the record and [it] must be consistent with the restrictions identified in the medical testimony.") (citation omitted).

Here, even if Knight is not presumptively disabled under listing 12.04(C)(2), the record reveals that the RFC, and by implication the VE hypothetical derived therefrom, was defective because the ALJ failed to account for, *inter alia*, Dr. Powell's opinion that Knight would miss more than four days per month due to her impairments or treatment needs. The VE testified that more than one unexcused absence per month would preclude gainful employment. (Tr. 60.) Additionally, a restriction to simple, routine, repetitive tasks appears to be insufficient to incorporate Dr. Powell's opinion that Knight suffers from marked limitations in concentration, persistence, or pace. *See Viles v. Colvin*, No. 3:14–cv–0534–SI, 2015 WL 1393296, at *11 (D. Or. Mar. 25, 2015) ("Although limiting a claimant to simple and repetitive tasks may, under some circumstances, properly incorporate 'moderate' limitations in concentration, persistence, and pace, 'marked' limitations require more.") (citations and footnote omitted*); see also Pierre v. Astrue*, No. 10-cv-130, 2011 WL 1832789, at *9–10 (D. Ariz. May 13, 2011) (finding that the ALJ erred in limiting the claimant to simple, unskilled, repetitive work because she had marked limitations in concentration, persistence, and pace).

## IV.    REMEDY

In a number of Social Security cases, the Ninth Circuit has "stated or implied that it would be an abuse of discretion for a district court not to remand for an award of benefits" when three conditions are met. *Garrison*, 759 F.3d at 1020 (citations omitted). Specifically, a district court should reverse and remand for an award of benefits when the following "credit-as-true" criteria are met:

> (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence,

> whether claimant testimony or medical opinion; and (3) if the
> improperly discredited evidence were credited as true, the ALJ
> would be required to find the claimant disabled on remand.

*Id*. Even when these "credit-as-true" criteria are satisfied, however, district courts in this circuit retain the "flexibility to remand for further proceedings when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act." *Id*.

Here, the Commissioner does not dispute that the record has been fully developed and that further administrative proceedings would serve no useful purpose. (*See* Def.'s Br. at 14.) Thus, the Court concludes that the first criteria is met. The second criteria is also met because the ALJ failed to provide legally sufficient reasons for rejecting Dr. Powell's medical opinion evidence. If Dr. Powell's improperly discredited evidence were credited as true, the ALJ would be required to find Knight disabled on remand, because Dr. Powell's opinion states that Knight is presumptively disabled under listing 12.04(C)(2), or because Knight's impairments would cause her to be absent from work at a rate that exceeds customary tolerances. Accordingly, the Court concludes that a remand for benefits is necessary because the record as a whole does not create serious doubt as to whether Knight is, in fact, disabled.

## CONCLUSION

For the reasons stated, the Commissioner's decision is reversed and remanded for payment of benefits.

IT IS SO ORDERED.

DATED this 10th day of January, 2017.

_____
STACIE F. BECKERMAN
United States Magistrate Judge